UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
ROBERT L. BIANCHI, JR.,        )
                               )
          Plaintiff,           )
                               )    CIVIL ACTION NO.
          v.                   )    07-CV-11960-PBS
                               )
PEGGY BARTLETT, R.N.,          )
                               )
          Defendant.           )
_____)
```

**MEMORANDUM AND ORDER**

March 31, 2011

Saris, U.S.D.J.

## I. Introduction

Plaintiff Robert L. Bianchi, Jr. alleges that University of Massachusetts Correctional Health Services ("UMCH"), Dr. Leonid Kotkin and Peggy Bartlett, R.N., acted negligently and with deliberate indifference to his serious medical needs while he was in prison in violation of the Eighth Amendment to the United States Constitution and state law. Ms. Bartlett moved for summary judgment, claiming that she did not act with deliberate indifference towards the plaintiff, and that she had immunity from both the plaintiffs' constitutional and state law claims.

On March 7, 2011, Magistrate Judge Collings issued a Report and Recommendation allowing Ms. Bartlett's motion in regard to the plaintiff's Eighth Amendment claim, and then declining to

exercise supplemental jurisdiction over the state law claims.
The plaintiff submitted objections.  While the issue is close,
after reviewing the record in this case, this Court does not
adopt the Report and Recommendation.  With regard to Bartlett's
motion, the Court **ALLOWS** the motion in part, and **DENIES** it in
part.

## II. Factual Background

When all reasonable inferences are drawn in plaintiff's
favor, the record contains the following facts, which are
undisputed except where noted.

Margaret Bartlett is a registered nurse who is at least in
part employed by the University of Massachusetts Medical School.
(See Barlett Dep. at 12.)  As part of the Medical School's UMass
Correctional Health Services(UMCH) program, Ms. Bartlett works as
a nurse at state correctional facilities. (See id.)  She is paid
hourly no matter how many patients she treats. (See id. at 87:7-
13.)  Generally, when she reports to work, she is the "nurse in
charge." (See Id. at 15.)  When serving in this role, she is the
person in the institution's infirmary who is responsible for the
treatment of patients. (See Id. at 29.)  This role involves
checking patients' vital signs and performing other diagnostic
tasks. (See id. at 30:17-19.)  However, when it comes to other
decisions relating to a patient's medical care, Ms. Bartlett must
defer to the judgment of an on-call physician.  For example, she

cannot transfer a patient to a hospital without at least consulting a physician, and she cannot prescribe medication. (See id. at 24; Ex. 9.)

Beginning in early 2006, the plaintiff, while a prisoner, was treated for kidney stones at various medical facilities. (Bianchi Aff. 3.) On January 15, 2006, he was admitted to Norwood Hospital for severe pain on his left side caused by kidney stones. (Id.) A week later, on January 23, 2006, a urologist failed to break up his kidney stone through a procedure called "laser lithotripsy."(Id. at 4.) Instead, the doctor moved the stone to the renal pelvis and placed a stent in the plaintiff's ureter. (Id. at 5.) Between January and April 2006, the plaintiff continued to receive medical care for his urological problems and resulting pain. (Id. at 6-7.) On May 5, 2006, because of severe pain, Dr. Kotkin removed the ureter stent. (Id. at 8.)

The following day, on May 6, 2006, at approximately 12:45 p.m., the plaintiff reported to the Health Services Unit of MCI-Norfolk and told Ms. Bartlett, the attending nurse, that he was experiencing severe pain in his side, that he had blood in his urine (hematuria), and that the day before, he had undergone a medical procedure involving the removal of a stent. (Bianchi Dep 29:5-6, 31:10-19; Bartlett Dep. 49:4-7.) He asked to be sent to the hospital immediately. (Bartlett Dep. 42:23-25.)

Ms. Bartlett, the sole nurse on duty, informed him that before determining whether he would be transferred to the hospital she would need to assess his condition and speak with a physician. (Bartlett Dep. 29:15-18, 43:6-8.) Ms. Bartlett claims that the plaintiff never told her what procedure he had undergone, but she assumed from his symptoms, and the statements she alleges he made, that he had undergone a cystoscopy, a procedure where physicians insert a long tube through the penis into the bladder so that they can examine the bladder wall, burn any tumors, and catch any kidney stones. (Bartlett Dep. 41:7-19.) Ms. Bartlett took the plaintiff's vital signs and sent him upstairs to the infirmary for observation. (Bartlett Dep. 40:24, 47:1-2; Bianchi Dep. 31:20-32:3.) She then paged Dr. Lorraine Hazard to notify her of the plaintiff's condition. (Bartlett Dep. 48:18-49:17.)

After paging Dr. Hazard, Ms. Bartlett went upstairs to check the plaintiff's medical record. (Bartlett Dep. 49:15-17.)  When she arrived upstairs, she found the plaintiff on the telephone. (Bartlett Dep. 50:23-24).  According to the plaintiff, he placed two phone calls regarding the inadequacy of his medical care. (Bianchi Dep. 42:9-47:5.)  The first call was to his mother, and the second call was to Massachusetts Correctional Legal Services. (Bianchi Dep. 42:9-47:5.)  When the plaintiff was making the calls, he was allegedly bent over, grabbing his side, and

grimacing through his teeth in pain. (Bianchi Aff. ¶ 17.)  Ms.
Bartlett, however, claims that the plaintiff did not appear to be
in pain. (Bartlett Aff. ¶ 20.) After the plaintiff made the phone
calls, Ms. Bartlett asked him to produce a urine sample.  Though
Ms. Bartlett collected the sample and visually examined it, she
did not perform a urinalysis. (Bartlett Dep. 71:16-18.)

Soon after providing a urine sample, the plaintiff returned
to his room and began to dry heave. (Bianchi Dep. 35:10-11.)
According to the plaintiff, the dry heaving was so loud that Ms.
Bartlett, who was in the hall outside his room, must have heard
it. (Id. at 52:8-10.)  When he saw Ms. Bartlett again, the
plaintiff did not inform her of his dry heaving, but he did tell
her that the pain was worsening and requested additional pain
medication. (Id. at 35:18-20.) Ms. Bartlett told the plaintiff
that she would not provide him with any more pain medication and
allegedly told him to "enjoy [his] Tylenol." (Id. at 35:22-24.)

At some point during this period, Dr. Hazard returned Ms.
Bartlett's page. (Bartlett Dep. 60:22-24.) Ms. Bartlett informed
Dr. Hazard that the plaintiff had stable vital signs, no fever,
nausea, or vomiting, and that she had examined the plaintiff's
urine and found no signs of blood. (Id. at 61:3-7.) She also
incorrectly told Dr. Hazard that the plaintiff had undergone a
cystoscopy the day before. (Id. at 61:4-6.) Dr. Hazard responded
that the plaintiff likely would need to go to the hospital that

day and told her to continue to observe him for any change in status. (Id. at 61:14-19.) The doctor instructed that if the plaintiff had a kidney stone, "it would declare itself" by the plaintiff becoming nauseous and vomiting. At that point, the plaintiff should be transferred. (Id. at 61:20-24, 18-19.)

At some point after allegedly dry heaving, the plaintiff began to vomit green bile. (Bianchi Dep. 53:20-54:5.) At. 3:00 p.m. there was a shift change for medical and correctional staff. (Ortiz Dep. 28:4-7.) Officer Gadiel Ortiz, who began his rounds at 3:15, saw the plaintiff vomiting. (Ortiz Dep. 28: 11-19; 36: 6-10.) Plaintiff also complained to Officer Ortiz that he was in pain. (Id.) Officer Ortiz then reported the plaintiff's condition to Ms. Bartlett and asked his lieutenant, Lieutenant Michael Hamm, to come to the infirmary because the plaintiff was in "a lot of pain." (Id. at 39:20-23.)

Kathleen Savage, R.N. ("Ms. Savage") also clocked in at 3:00 p.m. (Savage Dep.42:2-6.) She classified the plaintiff's pain level at 6 to 7 on a scale of 1 to 10 and estimated that the plaintiff had vomited approximately 100 cc's of bile by the time she first checked on him. (Id. at 67:3-17; 56:16-23.) Sometime after her arrival, Ms. Savage tested the plaintiff's urine for hematuria, and found that it had the maximum measurable blood to urine ratio.(Savage Dep. 46:26-47:6, 48:23-49:14.) At 4:30 p.m., Dr. Hazard authorized the plaintiff's transfer to the hospital.

(Ex. 13.) At approximately 5:30 P.M., the plaintiff arrived at
Norwood Hospital. (Ex. 14.) At Norwood the plaintiff had a CAT
scan, and was informed that his kidneys were shutting down and
one side of his bladder was decompressed. (Bianchi Aff. 26.)  On
May 6, 2006, he was transferred to Lemuel Shattuck Hospital,
where he was confined to bed until May 12, 2006. (<u>Id.</u>) As a
result of his severe kidney stones and complications of his
treatment, the plaintiff missed 35 days of work between May 2006
and March 2007. (<u>Id.</u>) The plaintiff allegedly continues to
experience limitations as a result of these events, including
difficulty controlling his urination, urinating many times a day,
and urinating in multiple streams.

### III. Summary Judgment Standard

Summary judgment "is appropriate when 'the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law.'" <u>Barbour v. Dynamics
Research Corp.</u>, 63 F.3d 32, 36-37 (1st Cir. 1995) (quoting Rule
56, Fed.R.Civ.P.).  To be granted summary judgment, "the moving
party must show that there is an absence of evidence to support
the nonmoving party's position." <u>Rogers v. Fair</u>, 902 F.2d 140,
143 (1st Cir. 1990)(citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317
(1986)).

Once the moving party has shown there is no genuine issue of material fact, "the burden shifts to the [nonmoving party] to establish the existence of a fact which is both 'material,' in that it might affect the outcome of the litigation, and 'genuine,' in that a reasonable jury could, on the basis of the proffered proof return a verdict for the [nonmoving party]." Brennan v. Hendrigan, 888 F.2d 189, 191 (1st Cir. 1989)(citations omitted). In order to avoid summary judgment, the non-moving party "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(internal citation marks omitted). In assessing the motion for summary judgment, the Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Barbour, 63 F.3d at 36 (citing Woods v. Friction Materials, Inc., 30 F.3d 255, 259 (1st Cir. 1994)).

## DISCUSSION

### A. Eighth Amendment Claim

According to the Supreme Court "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976)(citation omitted). To prevail on a claim under § 1983 alleging improper

medical care in prison in violation of the Eighth Amendment, the plaintiff must show both that he had a serious medical need and that the defendant was deliberately indifferent to that medical need. See Sires v. Berman, 834 F.2d 9, 12 (1st Cir. 1987).

Ms. Bartlett does not challenge the plaintiff's showing that he had a serious medical need. At stake in this case, then, is whether Ms. Bartlett's actions rose to the level of deliberate indifference. Deliberate indifference is not only shown through denial of medical treatment in order to punish an inmate, "[it] may also reside in 'wanton' decisions to deny or delay care, where the action is recklessness, 'not in the tort law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable.'" Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993) (citing Wilson v. Seiter, 501 U.S. 294, 297 (1992); DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991)). Because of the fact-intensive nature of this inquiry, and in particular its focus on the defendant's state of mind, it is often "unsuited to resolution on summary judgment." Sires, 834 F.2d at 13.

**1) The Report and Recommendation:**

The Magistrate Judge held that, despite the conflicting accounts of exactly what occurred while the plaintiff was under Ms. Bartlett's care, this case did not raise a genuine issue of material fact as to whether Ms. Bartlett acted with deliberate

indifference to the plaintiff's serious medical needs. The Report and Recommendation began by highlighting that the plaintiff remained in Ms. Bartlett's care for only about two hours. "So although the gravamen of Bianchi's complaint against Bartlett is that Bartlett 'ignored Bianchi for hours,' the record establishes that Bianchi was under Bartlett's care for slightly more than two hours, and under Nurse Savage's care when Bianchi's condition worsened. . . . While the time frame is not necessarily determinative of the claim, it forms the backdrop against which the Court views the sequence of events recounted by Bianchi." Report and Recommendation at 10-11 (citations omitted).

With this context established, the Report and Recommendation concluded that there was no indication that Ms. Bartlett was actually aware of the severity of the plaintiff's pain. Id. at 13. The court reasoned that even if the plaintiff was indeed holding his side and grimacing through his teeth when he produced the urine sample, "[n]othing suggests that Bartlett drew the inference of a substantial risk in large part because she found Bianchi standing and talking on the telephone rather than lying in bed." Id. at 13. To support this finding, the Report and Recommendation cites Ms. Bartlett's deposition, in which she stated that she knew the plaintiff was having "some discomfort," but she "wasn't sure" at the time whether he was faking his

condition in order to get out of the institution. Id. at 13
(citing Bartlett Dep. at 55-57.)

The Report and Recommendation then noted that "even if the
intensity of Bianchi's pain should have been obvious to Bartlett
at that juncture, she 'cannot be deliberately indifferent if
[she] responded reasonably to the risk, even if the harm
ultimately was not avoided.'" Report and Recommendation at 13
(citing Burrell v. Hampshire Cnty., 307 F.3d 1, 8 (1st Cir.
2002)).  According to the Magistrate Judge, Bartlett acted
reasonably in her initial efforts to care for the plaintiff
because she determined the plaintiff's vital signs were stable,
obtained a urine sample, and asked the plaintiff to return to bed
while she waited to speak to the doctor. Report and
Recommendation at 13-14.  After speaking with the doctor, the
Magistrate Judge found that Bartlett continued to act reasonably.
Dr. Hazard testified that she told Bartlett to pay particular
attention to whether the plaintiff was nauseous and vomiting and
to the appearance of the plaintiff's urine and whether he could
urinate. Id. at 14 (citing Hazard Dep. at 61-65.)  Bartlett did
not observe any signs of nausea and vomiting, and she collected a
urine sample but did not observe any hematuria.  She, thus,
"essentially followed Dr. Hazard's instructions." Report and
Recommendation at 15.

The Report and Recommendation characterizes Ms. Bartlett's alleged statement "Enjoy your Tylenol" as the plaintiff's purported "smoking gun indicative of deliberate indifference." Id. at 16. The Magistrate Judge determined, however, that "the most that can be said [about this statement] is that Bartlett wrongly thought that Bianchi's pain was less intense than he had represented because she had seen him out of bed on the telephone. . . Bianchi speculates that Bartlett must have heard his dry heaves, but it is undisputed that he never told her of this fact, even though he had the opportunity to do so. . . . [N]othing in the record – other than Bianchi's speculation – suggests that Bartlett had 'actual knowledge' that Bianchi had begun to experience the symptoms that Dr. Hazard indicated might suggest impending harm." Id. at 16. In sum, the Magistrate Judge determined that plaintiff's claim did not raise any genuine issue of material fact about either whether Ms. Bartlett was aware of the plaintiff's considerable pain or, even if she were aware the plaintiff was in pain, whether her treatment was reckless or wanton in such a way that implicate the Defendant's Eighth Amendment interests.

**2) Review of Report and Recommendation:**

The Report and Recommendation is reviewed de novo. 28 U.S.C. § 636(b)(1)(C).

Although the Magistrate Judge is correct that a showing of "reckless indifference" is difficult, the Court does not agree that no reasonable jury could find that that threshold has been met here. First, the record is replete with facts that would support a finding that Ms. Bartlett had actual knowledge of the plaintiff's considerable pain. According to the plaintiff, when Ms. Bartlett came upstairs while he was on the phone, he exhibited symptoms that suggest nearly unbearable discomfort. He was allegedly bent over, grabbing his side, talking through his teeth, and grimacing in pain. (Bianchi Aff. ¶ 17.) After the plaintiff had provided Ms. Bartlett with a urine sample, he returned to his room, where, according to the plaintiff, his pain worsened, and he began to dry heave. (Id. ¶ 18.) During this period, Ms. Bartlett allegedly walked by the plaintiff's room, from where she would have been able to hear his dry heaving. (Bianchi Dep. 52:8-10.) Around the same time, the plaintiff allegedly told Ms. Bartlett that he was in pain and asked for more pain medication. (Bianchi Dep. 35:16-36:4.) It is true that this understanding of the facts is supported mainly by the plaintiff's own recounting, but at this stage in the litigation all of the facts must be understood in the light most favorable to the plaintiff's case, and "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a

judge." <u>Sensing v. Outback Steakhouse of Florida, LLC</u>, 575 F.3d
145, 163 (1st Cir. 2009)(quoting <u>Reeves v. Sanderson Plumbing
Prods.</u>, 530 U.S. 133, 150 (2000))(internal quotation marks
omitted).

Whether a jury could find that Ms. Bartlett's response to
the plaintiff's condition falls "within the narrow band" that
constitutes deliberate indifference is a more difficult question.
<u>See</u> <u>Feeney</u>, 464 F.3d 158, 162 (1st Cir. 2006).

As a nurse, Ms. Bartlett was not authorized to administer
narcotic pain medication without a physician's order. (<u>See</u> Def.
Ex. 9.)  Similarly, she would not generally be authorized to make
a decision to transfer a patient to the hospital without
consulting a doctor. (<u>See</u> Hazard Aff. 33:8-12.)  Therefore, the
crux of the plaintiff's claim is not Ms. Bartlett's own decisions
regarding the course of the plaintiff's treatment, but, rather,
the content and timing of her communications with the on-call
physician Dr. Hazard.  The record indicates that when Ms.
Bartlett first spoke to Dr. Hazard, she informed her that the
plaintiff had reported complaining of pain and blood in the urine
and had insisted on going to the hospital.  She also mistakenly
informed Dr. Hazard that the plaintiff had undergone a cytoscopy.
Dr. Hazard responded by instructing Ms. Bartlett to "observe" the
patient and pay particular attention to whether he could urinate
and whether there was blood in his urine. (<u>See</u> Hazard Aff. at 62-

63.)  Dr. Hazard also informed Ms. Bartlett, however, that she should ensure that the plaintiff was not exhibiting signs of nausea and vomiting. (Id. at 48:15-16.)  Further, at her deposition in this case, Dr. Hazard testified that any information relevant to the plaintiff's nausea or very serious pain would have supported a decision to transfer him to the hospital immediately. (Id. at 49:1-6.)

There does not seem to be a dispute that Ms. Bartlett examined the plaintiff's urine at some point between 1:00 pm and 2:00 pm and did not find any indications of blood.[1]  She accurately reported these findings to Dr. Hazard.  However, there is sufficient evidence in the record for a jury to conclude that Ms. Bartlett failed to inform Dr. Hazard of other important pieces of information.  A jury could find that she inaccurately reported the procedure the plaintiff had undergone the day before, failed to disclose the full extent of the plaintiff's pain, and, most importantly, did not inform Dr. Hazard of indications that the plaintiff was nauseous.  Even if the dry heaving did not occur until after Ms. Bartlett's initial conversation with Dr. Hazard, it occurred before the plaintiff began vomiting and before Ms. Bartlett's shift ended.  At that point, Ms. Bartlett could have called Dr. Hazard to inform her of

---

[1]     Although Ms. Bartlett did not initially perform a urinalysis, there is no evidence that this failure was itself unreasonable in light of the fact that she visually examined the plaintiff's urine.

15

the plaintiff's change in status. A jury could find that, together, all of these actions rise to the level of deliberate indifference.

This conclusion is supported by the opinion of Dr. Richard Harkaway, a Board certified urologist who submitted an affidavit in this case. Dr. Harkaway reports that Ms. Bartlett's failure to take the plaintiff's complaints seriously constitutes a deviation from the standard of care. (Harkaway Aff. at ¶ 4(b).)[2] A finding that Ms. Bartlett's actions constitute malpractice does not mean that they necessarily rise to the level of deliberate indifference, see Feeney, 464 F.3d at 162, but this opinion certainly supports a finding of liability on the plaintiff's Eighth Amendment claim.

Further, though the Magistrate Judge may indeed be correct that Ms. Bartlett's statement "enjoy your Tylenol" reflects her disbelief that the plaintiff was in considerable pain given the fact that she had just seen him on the phone, this does not mean that a jury could not interpret it as evidence of deliberate indifference. Though proving deliberate indifference requires a

---

[2] Notably, Dr. Harkaway's opinion seems to suggest that Ms. Bartlett allowed plaintiff's pain to go untreated "for approximately four hours" until he was transferred to Norwood Hospital's ER. (See Harkaway Aff. at ¶ 4(b).) This understanding is not consistent with record evidence that suggests that Ms. Savage became responsible for the plaintiff at 3:00 pm. See Report and Recommendation at 10 n.3. However, though the opinion may reach too far in this regard, it still supports the conclusion that Ms. Bartlett's initial response to the plaintiff's pain was a deviation from the standard of care.

showing of actual awareness of impending harm, a jury could find
that a defendant's willful blindness to a prisoner's condition in
the face of compelling indications of severe pain and discomfort,
rises to this level. See Manarite v. City of Springfield, 957
F.2d 953, 956 (1st Cir. 1992). If the plaintiff's account is
credited, by the time that Ms. Bartlett told the plaintiff to
"enjoy [his] Tylenol," she should have been well aware of his
pain and nausea, and her actions could, thus, be interpreted as a
wanton disregard for the plaintiff's medical needs.  Together
with Ms. Bartlett's other actions, this statement could lead a
jury to find that Ms. Bartlett acted with deliberate indifference
to the plaintiff's medical needs. See Sherrod v Lingle, 223 F. 3d
605, 611-12 (7th Cir. 2000) (holding that if a prison official
knows that an inmate is at serious risk of appendicitis, and
gives the inmate aspirin and an enema and sends the inmate back
to his cell, a jury could find deliberate indifference).

This is a close case, and there are certain factors,
identified by the Magistrate Judge, that counsel in favor of
summary judgment.  For example, it is clear that no more than two
hours elapsed between when Ms. Bartlett first learned of the
plaintiff's nausea and when Ms. Bartlett's shift ended.  But the
fact that this delay was short does not necessarily preclude a
jury finding that a constitutional violation occurred. Cf.
Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000)(in regard to

alleged Eighth Amendment violation stating that "[t]he more basic the need, the shorter the time it can be withheld." (internal quotation marks and citations omitted)); <u>Gordon v. Faber</u>, 973 F.2d 686, 687 (8th Cir. 1992)(finding that forcing prisoners to remain outside in sub-freezing temperatures with only a jacket but no hat or gloves for between an hour and an hour and forty-five minutes could be found to violate the Eighth Amendment). The fact that Ms. Bartlett was only responsible for the plaintiff for a short period may cut against the plaintiff's argument that her failures caused the plaintiff's injuries, but that question has not been briefed or argued by the parties. Given the severity of the plaintiff's symptoms, a reasonable jury might determine that even slight delays in responding to his medical needs constitute deliberate indifference.

**3) Qualified Immunity:**

As a defense, Bartlett contends that she is a public employee who worked at University of Massachusetts Correctional Health Services, and, therefore, she is entitled to qualified immunity from suits arising from actions taken within the scope of her employment. The doctrine of qualified immunity is intended to ensure that "public officials performing discretionary functions [are] free to act without fear of retributive suits for damages except when they should have understood that particular conduct was unlawful." <u>Limone v.</u>

18

<u>Condon</u>, 372 F.3d 39, 44 (1st Cir. 2004).

As a preliminary matter, there is little dispute that University of Massachusetts Medical School is a public employer. <u>Cf.</u> <u>Orell v. UMass Memorial of Massachusetts Med. Ctr., Inc.</u>, 203 F. Supp. 2d 52, 60 (D. Mass. 2002)(Gorton, J.)(citing <u>Ali v.</u> <u>Univ. of Massachusetts Med. Ctr., et. al.</u>, 140 F.Supp. 2d 107, 110 (D. Mass. 2001)).

The plaintiff suggests, however, that even though Ms. Bartlett was employed by the University of Massachusetts, she exhibited sufficient independence from her employer to bring her outside the scope of qualified immunity protection. In <u>Burke v.</u> <u>Town of Walpole</u>, 405 F.3d 66 (1st Cir. 2005), the First Circuit held that a private forensic odontologist who contracted his services to the Norfolk County District Attorney's Office was protected by qualified immunity because he acted to assist the state in an investigation. <u>Id.</u> at 88.  Here, Ms. Bartlett not only acted on behalf of the state, but she was formally employed by a state agency.  She is, thus, "both subject to suit under section 1983 and eligible for the balm of qualified immunity ." <u>Camilo-Robles v. Hoyos</u>, 151 F.3d 1, 10 (1st Cir. 1998).

The test to determine whether a public employee is immune from a claim under the doctrine of qualified immunity has three parts. <u>Limone</u>, 372 F.3d at 44. First, the Court must consider whether, if the plaintiff's allegations are true, the state actor

19

violated the constitutional right of the plaintiff. <u>Id.</u> Second, the Court must consider whether the constitutional right at issue was a well established right at the time of the alleged violation. <u>Id.</u> Finally, the Court will consider whether a reasonable officer in a similar situation to the defendant would have understood the acts and omissions at issue to violate that constitutional right. <u>Id.</u>

With respect to the first prong, as discussed above, if the plaintiff's allegations are true, a reasonable jury could find that Ms. Bartlett violated the plaintiff's constitutional right to be free of cruel and unusual punishment.

Second, this right was well established at the time of the occurrence. In 1976, the U.S. Supreme Court ruled:

> [D]eliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

<u>Estelle v. Gamble</u>, 429 U.S. 97, 104-05 (1976)(holding that a reasonable jury could find that a jail doctor, a warden and a assistant warden acted with deliberate indifference in their care of a nineteen year old epileptic inmate who became critically ill while in jail and died three days after being transferred to the

hospital); <u>Miranda v. Munoz,</u> 770 F.2d 255, 259 (1st Cir. 1985).

Finally, there are enough disputed facts that this Court cannot determine whether a reasonable nurse in the defendant's position would have understood her actions to be in violation of this constitutional right without a factual determination made by a jury. <u>See</u> <u>Rodriquez-Marin v. Rivera-Gonzalez</u>, 438 F.3d 72, 83 (1st Cir. 2006)("The third prong is also a question of law, but factual questions, to the extent they are antecedent to this determination, must be determined by a jury."). If Ms. Bartlett was indeed aware of the plaintiff's considerable pain and nausea, a hotly disputed fact, and yet did not inform Dr. Hazard of these concerns either in a first call or a subsequent one, then a reasonable nurse in her situation should have been aware that her actions rose to the level of a constitutional violation. Therefore, at this juncture, the defendant cannot receive summary judgment on the basis of qualified immunity.

## B. Massachusetts Tort Claims Act

Ms. Bartlett also argues that she is protected from liability for negligence and malpractice claims under the Massachusetts Torts Claims Act (MTCA). Massachusetts law provides public employees acting within the scope of their job with immunity from personal liability. Mass. Gen. Laws ch. 258, § 2.

Immunity under the MTCA calls for a different inquiry into the employment relationship than does constitutional qualified

immunity.  Cf. Horta v. Sullivan, 4 F.3d 2, 15-16 (1st Cir.

1993)(explaining that the standard for determining whether an act

is a "discretionary function or duty" under a separate provision

of the MTCA diverges from the test for determining whether an act

is discretionary under constitutional qualified immunity

doctrine).  The legal principles guiding the determination of

whether a defendant is a public employee are "the same as those

that have determined whether an agent is a servant for whose

negligent acts a principal may be liable under the common law

doctrine of respondeat superior." Kelly v. Rossi, 395 Mass. 659,

481 N.E.2d 1340, 1342 (1985).  To be a public employee for the

purposes of immunity under the MTCA, an individual must be

"subject to the direction and control of a public employer." See

Smith v. Steinberg, 395 Mass. 666, 667 (1985).

The question of whether an employee is under the direction

and control of her employer is a question of fact. See Williams

v. Hartman, 413 Mass 398, 597 N.E.2d 1024, 1026 (1992)(physician

not entitled to summary judgment on MTCA immunity defense). A

defendant is not a public employee merely because she receives a

paycheck from a public agency. Id.  On the other hand, exhibiting

the discretion and judgment inherent in the medical profession

does not necessarily exclude someone from the MTCA's protection.

"Even where medical personnel exercise independent judgment in

treating their patients, they 'can still be deemed a servant

where the principal controls the details of [their] activities.'" Rodrigues v. Commonwealth, C.A. No. 05-04209-L2 (Mass. Super. Ct. Sept. 22, 2009).

UMCH exercised sufficient control over Ms. Bartlett's activities to make her a public employee under the MTCA. Massachusetts courts have frequently denied motions for summary judgment brought by publicly employed physicians seeking protection under the MTCA. See, e.g., Smith 481 N.E.2d at 1346-47("On this summary judgment record, it cannot properly be said that the doctor was indisputably subject to the direction and control of the Commonwealth acting through its agents."). But nurses present a different case. They must "function within the hierarchy of the [facilities] in which they work[, and they] are not free to exercise their independent judgment to the degree that doctors [are]." Tomaccio v. Hardy, No. 021055, 2007 WL 1630961, at * 4 (Mass. Super. Ct. May 25, 2007). As she was "in charge" at the HSU at MCI-Norfolk at the time in question, Ms. Bartlett may have exhibited more autonomy than the average nurse operating within a hospital. Nonetheless, in many other ways, her activities were closely directed by UCMH. Although she did have some control over where and when she worked, she did not see any patients on her own, and she was not paid by the number of patients she saw. See McNamara v. Honeymoon, 406 Mass. 43, 546 N.E.2d 139, 143 (1989)(citing these factors in determining it

appropriate to not disturb a jury's finding that a psychiatrist was a public employee); <u>see also</u>, <u>Rodrigues v. Commonwealth</u>, No. 05-04209, at 6 (Mass. Super. Ct. Sep. 22, 2009)(relying on similar factors to hold at the summary judgment stage that a nurse practitioner working for UMCH was protected by MTCA immunity).  Moreover, her autonomy was considerably cabined by the rules and policies of UMCH and the supervision of physicians. Ms. Bartlett could not administer narcotic pain medications without a doctor's order.  Nor could she transfer patients, including Mr. Bianchi, to a hospital without the approval of a physician.  For these reasons, Ms. Bartlett was a public employee for the purposes of the Massachusetts Tort Claims Act.

Because Ms. Bartlett was a public employee acting within the scope of her employment, plaintiff's claim of negligence must be dismissed under the Massachusetts Tort Claims Act. <u>See</u> Mass. Gen. Laws ch. 258, §2.

## **<u>ORDER</u>**

Ms. Bartlett's Motion for Summary Judgment (Docket No. 84) is **ALLOWED** on the ground she is a public employee entitled to immunity under the Massachusetts Tort Claims Act.  Otherwise the motion is **DENIED**.

<u>/s/ Patti B. Saris</u>
PATTI B. SARIS
UNITED STATES DISTRICT JUDGE